DECISION AND JUDGMENT ENTRY
This case is before the court on appeal from the Lucas County Court of Common Pleas, which affirmed the decision of the Ohio State Dental Board finding merit in three charges against appellant, Jon B. Dove, D.D.S. For the reasons that follow, we find that the decision of the Lucas County Court of Common Pleas should be affirmed.
This case stems from a complaint filed with the Ohio State Dental Board ("the Board") against appellant, a dentist. The complaint was filed by Tonya Hetrick, who complained of appellant's conduct during a December 29, 1997 office visit with Hetrick's then nearly three-year-old child, who is referred to throughout the proceedings as Patient No. 1. As appellant's and Hetrick's accounts of the office visit sharply contrast, each version of the story shall be recounted separately.
Hetrick testified that she brought her son in to see appellant on December 29, 1997, because her son had an abscessed tooth that needed immediate attention. Hetrick testified that she proceeded to the examining room, where she held her son on her lap. After looking at Patient No. 1's teeth, appellant explained to the mother that two of Patient No. 1's teeth would need to be extracted. According to the mother, appellant explained that he would prescribe Valium for the boy to help him relax during the procedure, a practice known as "conscious sedation." He also told Hetrick that they would take x-rays of the boy's teeth that day and that he (appellant) would write a prescription for Valium before Hetrick and her son left. Hetrick testified that appellant's assistant, Kim Mohre, took x-rays of the child's teeth: Mohre positioned the arm of the x-ray machine near Patient No. 1's mouth, put the film into the child's mouth, and then left the room momentarily, coming back in to announce that she was all done. She then put the x-ray equipment away.
Shortly thereafter, appellant re-entered the room carrying two pieces of paper and a pen. Hetrick testified that appellant sat down at a counter top in the examining room and showed her the two pieces of paper: one was a prescription for Valium (referred to at the hearing as Exhibit 5), and the other was a piece of paper giving separate instructions for administering Valium to the child (referred to at the hearing as Exhibit 6). The prescription was for five tablets of Valium, ten milligrams each. The instructions on the prescription were to give Patient No. 1 one pill one hour before the appointment. The separate instructions, however, stated, "Please give [Patient No. 1] 3 [underlined twice] tablets one hour before apt. Also bring child 1/2 hr before apt to see how Valium is working. Give tablet in Orange Juice. [B]ring orange juice w/you on day of apt." Hetrick testified that, after appellant read her the instructions on Exhibit 6, the instruction sheet, appellant told her that Exhibit 5, the prescription, was what she was to give the pharmacist, but that she should disregard the instructions on it. According to Hetrick, appellant said not to pay any attention to the pharmacist if the pharmacist gave her trouble, stating that "he [appellant] knew what he was doing and to trust him."
Hetrick also testified that appellant did not weigh her son before prescribing the Valium for him. According to her testimony, appellant asked her how much her son weighed and she stated that she could not remember: he weighed either twenty-nine or thirty-nine pounds. Appellant then picked up the child, according to the mother, and said, "Oh, he weighs a good 40 pounds" and set him back down. The patient's chart indicates that the child weighed thirty-nine pounds, but appellant admitted that he made that notation in the chart, testifying that he was relying on the mother's representation of her son's weight. On cross-examination, Hetrick testified that she was unsure how much her son weighed.
Hetrick testified that after the discussion about the Valium, appellant left the room, leaving the two pieces of paper on the counter top. As she was getting ready to leave, Mohre entered the room again, stating that she had taken the wrong x-rays and would need to take them again. Mohre then pulled the x-ray equipment out again and began putting film in Patient No. 1's mouth, scraping the child's gum near the abscessed tooth in the process. At this point, according to Hetrick, the boy became terribly upset and uncooperative. Appellant then re-entered the room and tried to work with the child, to no avail. It became clear to everyone that the child was not going to allow any more x-rays. Hetrick testified that appellant advised bringing the child back for a future appointment once the child had taken the Valium so that appellant could get x-rays and extract the teeth all in one appointment. Hetrick also testified that as she was leaving the examining room, a dental assistant said, "Don't forget these," referring to the prescription and the separate instruction sheet, and she took them off the counter and proceeded through the hallway to the door.
As the mother and child were leaving, the mother testified that appellant stated, "if your son is going to act in this manner, I think the best we can do is to give him four tablets in orange juice crushed before he comes," and she also testified that appellant stated that she should "be sure to bring the orange juice and the fifth pill with us." According to Hetrick, appellant and the receptionist stopped her on her way out to remind her to make another appointment, which she did, but she stated that she had no intention of keeping it. In fact, she took her son to another dentist who extracted the abscessed tooth. She subsequently filed a complaint with the Board because she believed that appellant improperly prescribed Valium to her son. She never filled the prescription.
Appellant's account of the facts is similar in many respects, but his account of the facts begins to diverge at the point where he prescribed the Valium and gave instructions for its administration. According to appellant, after initially talking to the mother and looking into the child's mouth (to the extent that the child allowed this), he began to take x-rays. According to appellant, he put a lead apron over the mother and the child, and both he and Mohre put the x-ray equipment in place. He testified that Mohre then held the x-ray tube in place while appellant left the room to push the button to snap the x-ray picture. According to appellant, because the child was moving, the x-rays that he took were not particularly clear, and he was only able to get two of the four x-rays he needed. Because of the child's demeanor, appellant testified that he decided to take a "time-out" break.
While taking this break, appellant testified that he began explaining to Hetrick that he would need to prescribe Valium for the child in order to perform the tooth extraction at the child's next visit. He sat down in the examining room and wrote out Exhibit 6, the separate instruction sheet, which indicated that Hetrick was to administer three Valium tablets to Patient No. 1. Appellant did this, he testified, before he wrote out the prescription for five ten-milligram tablets. According to appellant, when he wrote out the instruction sheet, Exhibit 6, he was intending to prescribe two-milligram tablets; therefore, the instruction sheet would have instructed Hetrick to administer three two-milligram tablets to Patient No. 1 — a total of six milligrams.
After discussing Exhibit 6 with Hetrick, appellant testified that he was called into another examining room to check on another patient. Appellant testified that when he returned to the room, he worked with the child for about fifteen minutes trying to get additional x-rays, but the child would not cooperate. At this point, according to appellant, he decided that Patient No. 1 would require more Valium for the tooth extraction than appellant originally anticipated. Accordingly, appellant wrote Exhibit 5, the prescription, which was the prescription for five ten-milligram tablets, intending that the instruction sheet be disregarded. He testified that he gave the mother the prescription with verbal instructions to bring the Valium and some orange juice with the child one-half hour before the appointment and that appellant would administer the Valium to the child in the office. According to appellant, he told the mother that he would administer ten milligrams to the child, and he flatly denied telling the mother that he would give the child up to thirty milligrams of Valium.
Appellant states that he never gave Exhibit 6, the instruction sheet, to Hetrick. He testified that he again reiterated to Hetrick that she was to bring the Valium and some orange juice one-half hour before the appointment and he would administer the Valium to Patient No. 1. He concedes that these oral instructions differ from the instructions on the prescription, which indicate that the mother is to administer ten milligrams of Valium to the child one hour before the appointment. Appellant agrees with Hetrick's testimony that he stopped her on her way out and reminded her to make another appointment.
The Board's investigator, Mike Flugge, visited appellant's office on January 8, 1998, in response to Hetrick's complaint. Flugge testified at the hearing that, in response to a records release signed by Hetrick, appellant turned over Patient No. 1's chart. After confirming that appellant had a license to perform conscious sedation and examining the diplomas and certificates on appellant's wall, Flugge asked appellant, "Who takes the x-rays?" According to Flugge, appellant called Mohre over and said, "This is Kim Mohre, she takes my x-rays." Flugge testified that he asked Mohre if she had her radiology license, and she responded that she was still in school. Flugge testified that he then directed Mohre to "cease taking x-rays," and Mohre and appellant agreed to follow his instructions.
At the hearing, appellant confirmed that Flugge visited his office on January 8, but he offers a different account of the discussion about x-rays. According to appellant, Flugge never asked him who performed the x-rays, and appellant never replied that Mohre did. According to appellant, Flugge simply asked Mohre whether she had her radiology license and, when she responded that she did not, Flugge stated to her, "I wouldn't be taking x-rays," or words to that effect, and appellant responded that she did not take x-rays.
Both appellant and Flugge testified that appellant called Flugge on the phone on January 12, 1998. Flugge testified that when appellant called him on that date, appellant was "shook up" because the media was outside his office. Appellant asked Flugge what the status of the investigation was. Flugge testified that he informed appellant that the investigation was now "out of his [Flugge's] hands," and that he should contact an attorney for advice on the media attention. He also testified that he asked appellant why the media was there, and he stated that appellant responded, "They are saying that I was going to give a three-year old 30 milligrams of Valium and in any case that would be okay to do that," adding, "I was going to have that administered in my office." Appellant denies making this statement to Flugge, testifying that there "would be a problem" prescribing thirty milligrams of Valium to a three-year old child.
Appellant testified that he created a document on January 12, 1998 labeled "Addendum to December 29, 1997," and he stated that he created it for Patient No. 1's chart as a way of protecting himself. This addendum, which was signed by appellant and Mohre, notes the prescription for five ten-milligram tablets, and states, "Told pt. that we could use three pills of Valium if needed." Though appellant again testified that the mention of three tablets referred to two-milligram tablets, appellant conceded that the addendum makes no mention of two-milligram tablets.
Two experts testified at the hearing: Robert L. Creedon, D.D.S. and Daniel E. Becker, D.D.S. For purposes of testifying at the hearing, Dr. Creedon was recognized as an expert in the areas of pediatric dentistry and conscious sedation, and Dr. Becker was recognized as an expert in the area of conscious sedation. In short, Dr. Creedon testified that the appropriate dosage for oral Valium in pediatric patients is, at most, .6 milligrams per kilogram of weight. However, the maximum dosage under any circumstances is fifteen milligrams. Dr. Creedon based his testimony on an American Dental Association manual, on a chapter he wrote in a book by authors McDonald and Avery, and on "all of the textbooks and sources that speak to a specific use of a specific drug." However, Dr. Creedon conceded that a maximum dosage for oral Valium for pediatric patients is not prescribed by any manual of the American Academy of Pediatric Dentistry, and he could not specifically name any study that concluded that fifteen milligrams was the maximum dosage. On the ultimate issue, Dr. Creedon testified that prescribing thirty milligrams of oral Valium for a child would fail to conform to the accepted standards of the profession. At the close of Dr. Creedon's direct examination, appellant's attorney stated, "And Mary [the Board's attorney], we would have readily stipulated 30 or 40 milligrams is below the standard of care; so whatever that's worth." Dr. Creedon also testified that writing a prescription and also writing separate instructions that contradict the instructions on the prescription is conduct that fails to conform to the standards of the practice of dentistry.
Dr. Becker agreed with Dr. Creedon that the calculation for determining the appropriate dosage of oral Valium for a child is .3 to .6 milligrams per kilogram of weight. Therefore, according to Dr. Becker, the initial dose for a forty-pound child would be twelve milligrams. However, he also testified that if that amount was ineffective, he would give another five or ten milligrams after an hour. According to Dr. Becker, the maximum dose for a two-to three-hour appointment would be thirty milligrams. He also agreed that an initial dose of thirty milligrams for a forty pound child for the first attempt at behavioral management would be excessive, but he doubted that it would be dangerous. On cross-examination, he conceded that, while thirty milligrams would be appropriate over the course of an entire appointment, a dosage of thirty milligrams one hour before the appointment would be excessive.
Finally, appellant again testified on the second day of the hearing. At that time, he "clarified" his earlier testimony that he only intended to give Patient No. 1 ten milligrams of Valium by saying that he was referring only to the initial dose. According to appellant's testimony on this day, he could have gone up to thirty milligrams over the course of the appointment. On cross-examination, the following exchange took place:
 "Q: Last week, you testified that you agreed that giving 30 milligrams of Valium to a three-year old fell below the standard of care, and this week you're saying that it's not below the standard of care.
"A: If it —
"Q: Can you explain that?
 "A: Yeah. If I'm talking initial dosages. If I was going to give an initial dose of 30 milligrams, that is below the standard of care.
 "Q: Okay. What time frame do you think is appropriate then in which to give 30 milligrams?
 "A: It depends on the procedure. It really does. It could be an hour, hour and a half after initial dose. Anywhere between — If the initial dose doesn't seem to be working after 45 minutes to an hour, you can supplement the dose.
 "Q: Okay. You didn't specify that in your testimony last week; is that correct?
"A: It wasn't asked.
 "Q: Your attorney asked you, would you agree that 30 milligrams falls below the standard of care, and you said, yes, I do?
"A: For initial dosages.
"Q: You didn't say that though.
"A: I'm clarifying."
On February 12, 1998, the Board issued to appellant a "Notice of Opportunity for Hearing," which details the three counts against appellant. Count One states, "On or about December 29, 1997 you improperly prescribed Valium for Patient #1," further stating that such conduct violates R.C. 4715.30(A)(7). Count Two states, "On or about January 7, 1998, it was revealed you are permitting your dental assistant, Kim Moore [sic], to take radiographs without first being licensed by the Ohio State Dental Board," further stating that such conduct violates R.C.4715.30(A)(7) and (A)(9). Count Three is not before this court on appeal. On March 6, 1998, appellant requested a hearing, and the hearing was ultimately held over three days: May 11, 1998, May 18, 1998, and May 26, 1998.
On or about September 8, 1998, the Board's hearing examiner issued his sixty-three page Report and Recommendation in which he thoroughly reviewed the testimony and made findings of fact and conclusions of law. Serving as the fact-finder, the hearing examiner discredited much of appellant's testimony, and he found that all three counts were established by at least a preponderance of the evidence. As to Count One (improperly prescribing Valium), the hearing examiner recommended that appellant's license to practice dentistry in Ohio be revoked; as to Count Two (allowing an unlicensed person to take radiographs), the hearing examiner recommended that appellant's license to practice dentistry in Ohio be suspended for two years.
On or about October 14, 1998, the Board issued its Adjudication Order. In that order, the Board modified the hearing examiner's recommendation. Pertinent to this appeal, the Board ordered that appellant's license to practice dentistry in the State of Ohio be suspended for six months and that he immediately cease the practice of conscious sedation. The Board also ordered that appellant's license to practice conscious sedation be permanently revoked. Finally, the Board ordered that certain conditions be met before appellant's license to practice dentistry be reinstated, and it set probationary terms to take effect upon reinstatement. The Board also notified appellant of his right to appeal to the common pleas court in accordance with R.C. 119.12.
Appellant appealed the Board's Adjudication Order to the Lucas County Court of Common Pleas. On July 28, 1999, the Lucas County Court of Common Pleas issued its Opinion and Judgment Entry finding that the Board's Adjudication Order was supported by reliable, probative, and substantial evidence and that it was in accordance with law. Accordingly, the common pleas court affirmed the Board's Adjudication Order in all respects. Appellant now appeals from the July 28, 1999 Opinion and Judgment Entry of the Lucas County Common Pleas Court, setting forth two assignments of error:
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN AFFIRMING THE BOARD'S ORDER ON COUNT I, WHEN THE ORDER WAS NOT SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE.
 "THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN AFFIRMING THE BOARD'S ORDER ON COUNT II, WHEN THE ORDER WAS NOT SUPPORTED BY RELIABLE, PROBATIVE AND SUBSTANTIAL EVIDENCE."
R.C. 119.12 provides that the court of common pleas may affirm the agency's decision if it is supported by "reliable, probative, and substantial evidence and is in accordance with law." In this case, the common pleas court found that the Board's decision was so supported and was in accordance with law. Our review of the decision of the common pleas court is limited: we may only reverse if the common pleas court abused its discretion.Pons v. Ohio State Medical Board (1993), 66 Ohio St.3d 619,621, rehearing denied (1993), 67 Ohio St.3d 1439; Am.Legion Post 0046 v. Liquor Control (1996), 111 Ohio App.3d 795,799. Abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, quoting State v. Adams (1980), 62 Ohio St.2d 151,157. Moreover, reviewing courts are to give due deference to the agency's interpretation of the technical and ethical requirements of its own profession. Pons, 66 Ohio St.3d at 621.
With regard to the first assignment of error, the hearing examiner's finding that appellant intended to prescribe an initial dose of thirty milligrams of Valium to Patient No. 1 came as the result of a credibility determination: the examiner found Hetrick to be credible and appellant not to be credible. With regard to the finding that this dosage of Valium deviated from the standard of care, the examiner had before him divergent expert testimony on the maximum dosage appropriate for children; however, also before the examiner was expert testimony that was consistent on one point: thirty milligrams of Valium for a three-year old child is too high a dosage for the first visit. On his first day of testimony, appellant conceded this fact. The common pleas court, having reviewed the record and the Board's decision, found the decision to be supported by reliable, probative, and substantial evidence and in accordance with law. Based on the same record, we cannot say that the trial court abused its discretion.
Further, both the hearing examiner and the common pleas court discounted appellant's argument that he did not improperly prescribe Valium because the prescription, on its face, called for an appropriate dosage. Count One alleges that appellant's conduct departed from or failed to conform to the accepted standards for the profession when he "improperly prescribed Valium for Patient #1." This allegation encompasses more than merely writing a prescription for an inappropriate dosage of Valium. In finding merit in Count One, the hearing examiner focused not only on the prescription itself but on all of the circumstances surrounding the prescription. The hearing examiner apparently credited the testimony of Dr. Creedon, who testified that providing instructions to a patient different than those written on the prescription is conduct that falls below the standard of care for dentists. Also before the hearing examiner was Dr. Becker's testimony that such conduct is "not proper." In concluding that the Board met its burden as to Count One, the hearing examiner considered the prescription, the instruction sheet, and the expert testimony about the proper dosage of Valium for children and the proper method of prescribing drugs. The common pleas court held that the hearing examiner was correct in considering all of this evidence and held that the Board's decision was properly supported and in accordance with law. Based on the record, we cannot say that the common pleas court abused its discretion in so holding. Accordingly, appellant's first assignment of error is not well-taken.
Similarly, in finding that appellant allowed Mohre to take radiographs without a license, the hearing examiner, acting as a fact-finder, made a credibility determination. He credited the testimony of Hetrick and Flugge, the Board's investigator, and he discredited appellant's testimony. Upon review of the entire record, the common pleas court found this decision to be supported by reliable, probative, and substantial evidence and in accordance with law. Upon review of the same record, we cannot say that the common pleas court abused its discretion. Accordingly, appellant's second assignment of error is not well-taken.
On consideration whereof, the court finds that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Court costs assessed to appellant.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
HANDWORK, J., SHERCK, J. PIETRYKOWSKI, J., CONCUR.